IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BETH A. McGEE,

        Plaintiff,

  v.                                                Civil Action 2:15-cv-894
                                                      Judge Michael H. Watson
                                                       Magistrate Judge Jolson

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff, Beth McGee, filed this action under 42 U.S.C. §§ 405(g) and 1383(c) seeking review of a decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits. For the reasons that follow, it is **RECOMMENDED** that the Plaintiff's statement of errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

**I.    FACTUAL AND MEDICAL BACKGROUND**

Plaintiff applied for benefits on September 22, 2011, alleging disability since January 1, 2009, due to: Systemic Lupus Erythematosus ("lupus"), cholastatic hepatitis, liver damage, autoimmune hemolytic anemia, Hodgkin's disease, coronary heart disease, hypothyroidism, back pain, anxiety, and depression. (Doc. 14 at 3). Plaintiff was last insured on December 31, 2011. (Tr. 50, PAGEID #102).

After initial administrative denials of Plaintiff's claims, an Administrative Law Judge ("ALJ") heard her case on October 24, 2013. (Tr. 41, PAGEID #93). In a decision dated

November 19, 2013, the ALJ denied benefits. That became the Commissioner's final decision on January 22, 2015, when the Appeals Council denied review.

Plaintiff filed this case on March 13, 2015, and the Commissioner filed the administrative record on June 16, 2015 (Doc. 10). Plaintiff filed a Statement of Specific Errors on August 18, 2015 (Doc. 14), the Commissioner responded on November 16, 2015 (Doc. 19), and Plaintiff filed a Reply Brief on December 2, 2015 (Doc. 20).

### A.  Personal Background

Plaintiff was born on November 27, 1961 (Tr. 48, PAGEID #100), and she was 47 years old on the alleged onset date of disability (Tr. 50, PAGEID #102). She has a high school education and cosmetology training (Tr. 49, PAGEID #101), and work experience as a filing clerk, switchboard operator, and data-entry clerk (Tr. 54, PAGEID #106). Plaintiff also worked as a receptionist (Tr. 53, PAGEID #105), and as a salesperson for two different companies (Tr. 51, PAGEID #103).

### B.  Hearing Testimony

At the hearing, Plaintiff testified that she is "tired all the time," needs to watch for infections, cannot be exposed to light, and suffers from a weakened immune system. (Tr. 56-57, PAGEID #108-109). Plaintiff indicated that, due to her immune deficiency problems, she is sick "close to 40" weeks per year. (Tr. 70, PAGEID #122). She takes Prednisone and Plaquenil for lupus, and suffers from Hepatitis C and a bad back. (Tr. 57, PAGEID #109). Plaintiff's lupus causes her to suffer from a rash that is sore and itches, which is related to exposure to light, and a foggy mind. (Tr. 64-65, 68, PAGEID #116-117, 120). Plaintiff has not had surgery since 2008, when she had a part of her intestine removed in a bowel resection. (Tr. 58, PAGEID #110). Plaintiff testified to problems with her bowels, citing a need to take Metamucil. *Id*.

Plaintiff also testified that she is able to walk a mile, but she may "hurt later" or "hurt the next day." (Tr. 60, PAGEID #112). Plaintiff can bend forward and squat; stand for approximately 15 to 20 minutes; and sit for an hour. (Tr. 61-62, PAGEID #113-14). Plaintiff has no problems with her hands and arms, and can lift 10 to 15 pounds. (Tr. 61, PAGEID #113).

Plaintiff is able to take care of her personal hygiene, including showering, bathing, dressing, and washing her hair. (Tr. 65, PAGEID #117). Although Plaintiff needs to pace herself, she tidies her house, dusts, makes the bed, and does laundry. (Tr. 66, PAGEID #118). For leisure, Plaintiff reads, gardens, does jigsaw puzzles, and plays toss with her dog. (Tr. 66-67, PAGEID #118-19). Plaintiff belongs to the Ladies Auxiliary of the American Legion, where she volunteers approximately two to three hours per month. (Tr. 67, PAGEID #119). If Plaintiff exerts herself by, for example, volunteering and cleaning, she needs a couple of days to recover. (Tr. 68, PAGEID #120).

The vocational expert testified that a hypothetical person of similar age and education as Plaintiff with a limitation of light exertional work could perform Plaintiff's past jobs as file clerk, telephone operator, data-entry clerk, general merchandise sales representative, and receptionist. (Tr. 74, PAGEID #126). In addition, the vocational expert testified that a hypothetical person of similar age and education as Plaintiff with an exertional level changed to sedentary work could perform Plaintiff's past jobs as receptionist, telephone operator, and data-entry clerk.

**C.    Third-Party Report**

James McGee, Plaintiff's husband, completed a third-party report. Mr. McGee reiterated that Plaintiff is unable to stand for long periods, tires easily, and is sensitive to light. (Tr. 250, PAGEID #302). Mr. McGee stated that Plaintiff's daily activities include reading, watching television, some cooking, feeding the dog, and cleaning. (Tr. 251, PAGEID #303; Tr. 254,

3

PAGEID #306). Mr. McGee indicated that Plaintiff has no problem with personal care, although it now takes her additional time, and she does light dusting and places the dishes in the dishwasher. (Tr. 251-52, PAGEID #303-304). In addition, Mr. McGee stated that Plaintiff is able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (Tr. 253, PAGEID #305). Mr. McGee also stated that Plaintiff no longer hikes or goes to the beach, does less yard work and cleaning, and has difficulty sleeping. (Tr. 251, PAGEID #303).

      D.      **Relevant Medical Evidence**

Plaintiff alleges an onset date of January 1, 2009. The administrative record includes medical records before and after that date.

           1.      **Before Onset Date**

Plaintiff visited Parks Dermatology on July 15, 2008, and August 6, 2008, for a painful rash related to lupus, with a low-grade fever. (Tr. 474-77, PAGEID #526-529). When Plaintiff returned on August 12, 2008, it was noted that her "[l]upus flare" was "resolving," and a handwritten note reflects that Plaintiff was "doing great!" (Tr. 473, PAGEID #525). Plaintiff returned to Parks Dermatology on August 19, 2008, and it was reported again that she was "doing great!" with respect to her lupus. (Tr. 472, PAGEID #524).

Mayo Clinic records from October 29, 2008 to November 1, 2008 reflect that Plaintiff underwent a small bowel resection, which she tolerated well. (Tr. 285, PAGEID #337). Prior to surgery, Plaintiff presented with a history of persistent nausea, vomiting, and weight loss (Tr. 290, PAGEID #342), though Plaintiff's appearance was "normal" and she demonstrated "[n]o signs of distress" (Tr. 292, PAGEID #344). The record further indicates that Plaintiff was "able to walk 2-3 blocks and go up a flight of stairs without chest pain or shortness of breath." (Tr. 291, PAGEID #343). It was opined that Plaintiff's small obstruction developed from radiation

4

for lymphoma. (Tr. 295, PAGEID #347).

Mayo Clinic records from December 12, 2008, reveal that Plaintiff underwent a biopsy for lesions that were detected during an MRI on her spine. (Tr. 301, PAGEID #353). The biopsy was found to be "nondiagnostic" and Plaintiff was reportedly "asymptomatic in these areas." (Tr. 307, PAGEID #359).

### 2. After Onset Date

A record from Plaintiff's return visit to Parks Dermatology on April 20, 2009, reflects that Plaintiff's "lupus [was] doing ok" and her condition was "stable." (Tr. 468, PAGEID #520). Plaintiff's records demonstrate that she had lesions on her back on April 7, 2010 (Tr. 466, PAGEID #518), and on her back and chest on October 6, 2010 (Tr. 350, PAGEID #402). Plaintiff was seen again on October 14, 2009, and it was reported that she was using sunblock and having good results. (Tr. 353, PAGEID #405). Upon reexamination on October 19, 2010 (Tr. 347, PAGEID #397), and again on April 6, 2011 (Tr. 345, PAGEID #397), Plaintiff's skin was noted to have healed.

Due to her history of coronary artery disease, Plaintiff underwent an "angioplasty of the atrioventricular circumflex" on December 27, 2009. (Tr. 337, PAGEID #389). Plaintiff had a follow-up cardiology visit on March 4, 2010, where she reported suffering from an "'aphasic' episode where she was verbally non-responsive and was staring into space." *Id.* At the appointment, Plaintiff declined a neurologic evaluation, indicating that she would call if she had recurrent episodes. (Tr. 339, PAGEID #391).

About six months later, Plaintiff had a return cardiology visit on September 2, 2010, during which it was noted that Plaintiff was given "[o]n-going care" for "[c]oronary artery disease" and "[m]oderate mitral and tricuspid regurgitation." (Tr. 311, PAGEID #363). The

treating physician noted that Plaintiff was asymptomatic, and her general health status was unchanged. *Id*. The treating physician recommended that Plaintiff engage in 45 minutes of aerobic exercise at least 5-6 times a week, and that she return for a follow-up in 10 to 12 months. (Tr. 313, PAGEID #365).

Plaintiff had a return visit for hepatitis on April 7, 2010. (Tr. 334, PAGEID #386). Although Plaintiff had "severe itching, with cholestatic symptomatology, and jaundice," she had a "gradual resolution of her symptoms . . . ." *Id*. Plaintiff expressed feeling "the best she ha[d] felt in months," and her anemia was "asymptomatic." (*Id*.; Tr. 335, PAGEID #387).

Plaintiff had a number of return visits for hematology. During her appointment on May 4, 2010, it was noted that Plaintiff was "feeling a lot better," had "[m]ore energy," had "been physically active," had no skeletal pain, no respiratory symptoms, and no cardiac symptoms. (Tr. 330, PAGEID #382). The physician also noted that Plaintiff still had abnormalities in her spine. (Tr. 331, PAGEID #383). Plaintiff expressed "[f]eeling a lot better" on June 7, 2010, and medical records state that Plaintiff had "responded to Prednisone very well." (Tr. 328, PAGEID #380). It was noted on August 2, 2010, that Plaintiff "felt well," and "ha[d] no new complaints of fatigue or other concerning symptoms for anemia." (Tr. 323, PAGEID #375). On September 2, 2010, the treating physician's review of Plaintiff's systems was "[e]ssentially unremarkable." (Tr. 318, PAGEID #370). Likewise, on September 27, 2010, Plaintiff was "[f]eeling well," had "[n]o back pain," and "[n]o cardiac symptoms." (Tr. 309, PAGEID #361). Plaintiff reported "feeling tired a lot" during an appointment on February 8, 2011, indicating that her arms felt tired when she put them above her head. (Tr. 307, PAGEID #359).

Plaintiff also underwent a blood transfusion on May 5, 2010. (Tr. 298, PAGEID #350). Although it is not clear from her records why she needed the blood transfusion, Plaintiff tolerated

6

it well and was discharged in stable condition. *Id.* Plaintiff also had a return visit for hypothyroidism on September 26, 2011, during which she had no complaints or symptoms. (Tr. 359, PAGEID #411).

Plaintiff visited Dr. Charles Geiger for "a regular check up" for thyroid, anemia, coronary artery disease, and lupus on October 1, 2012. (Tr. 448, PAGEID #500). Plaintiff reported that she felt "tired frequently" and was experiencing "back pain down to [her] hips." *Id.* Plaintiff's skin appeared normal, with no rash. (Tr. 451, PAGEID #503). Plaintiff saw Dr. Geiger again on February 1, 2013, to follow-up on lab results and also for examination of a rash on her arm, which was "going on for a few months but getting better." (Tr. 443, PAGEID #495). Plaintiff also had a knot behind her right ear that was sore for approximately ten days. *Id.* At that appointment, Plaintiff reported no pain (Tr. 444, PAGEID #496), and specifically no chest pain and no palpitation (Tr. 445, PAGEID #497). In addition, Plaintiff's chronic conditions were noted to be stable. (Tr. 444, PAGEID #496).

On August 26, 2013, Dr. George Cholak, a non-treating physician with access to Plaintiff's medical records, signed a form designed to follow Social Security Listing 14.02 for lupus. (Tr. 457, PAGEID #509). The word "Yes" is checked to indicate that Plaintiff's condition involved the following body systems: joints, muscles, ocular, respiratory, cardiovascular, digestive, skin, neurological, and mental. *Id.* The word "Yes" is also checked to indicate that the condition had lasted or was expected to last at least twelve months. (Tr. 458, PAGEID #510). Where the form requests dates and results of testing, a handwritten note states "Mayo," and, in the comments section, a handwritten note states "Mayo Clinic." *Id.* At the hearing, Plaintiff's counsel stated that nurses completed the form, and "Dr. Cholak signed off on it." (Tr. 47, PAGEID #99).

7

E.      State Agency Assessments

State agency consultants, Dr. John Mormol and Dr. Rachel Rosenfeld, reviewed Plaintiff's medical records, and each separately concluded that Plaintiff's impairments were not severe.  (Tr. 86-95, PAGEID # 138-47).  The reviewing doctors did not review Mayo Clinic records which Plaintiff submitted after they had conducted their review.  The additional records pertain to the small bowel obstruction and resulting surgery that took place before the onset date, lesions found prior to the onset date resulting from lymphoma, and a blood transfusion which occurred after the onset date.  (Tr. 285-306, PAGEID #337-58).

F.      The ALJ's Decision

On November 19, 2013, the ALJ issued an unfavorable decision.  (Tr. 26-40, PAGEID #78-92).  The ALJ determined that Plaintiff had the following severe impairments:  lupus, coronary artery disease, cholestatic hepatitis, autoimmune hemolytic anemia, and hypothyroidism.  (Tr. 28, PAGEID #80).  The ALJ found that she did not, however, meet the requirements of an impairment listed in 20 CFR Subpart P, Appendix 1.  (Tr. 29, PAGEID #81).

The ALJ ultimately found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except that she could not climb ladders, ropes, or scaffolds; only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; could not have concentrated exposure to temperature extremes, vibration, fumes, dust, odors, gases, and poor ventilation; and must avoid hazards such as moving plant machinery and unprotected heights. (Tr. 30, PAGEID #82).  The ALJ opined that Plaintiff had the ability to perform her past job as a receptionist, file clerk, telephone operator, data-entry clerk, or general merchandise sales representative, which were not precluded despite his RFC finding.  (Tr. 34-35, PAGEID #86-87).

II.   **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002).

III.  **DISCUSSION**

In her statement, Plaintiff assigned three errors. She contends that the ALJ committed reversible error in failing to provide a specific rationale for rejecting her testimony as required by Social Security Ruling ("SSR") 96-7p.  Second, Plaintiff argues that the ALJ's analysis of her lupus is flawed, and, consequently, his conclusion that Plaintiff's impairments do not meet or equal Listing 14.02 is not supported by substantial evidence.  Finally, Plaintiff argues that the ALJ erred in failing to obtain a medical expert to assist in interpreting the additional medical evidence received after review by the state agency medical consultants.

    A.   **The ALJ's Credibility Determination**

In evaluating a claimant's credibility, an administrative law judge must consider the objective medical evidence and the following factors:

  1. The individual's daily activities;

  2. The location, duration, frequency, and intensity of the individual's pain or other

>symptoms;
>
>3. Factors that precipitate and aggravate the symptoms;
>
>4. The type, dosage, effectiveness, and side effects of any medications the individual takes to alleviate pain or other symptoms;
>
>5. Treatment, other than medication, the individual receives or has received for relief of pain and other symptoms;
>
>6. Any measures other than the treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
>7. Any other factors concerning the individual's functional limitations and restrictions due to pain and other symptoms.

SSR 96-7, 1996 WL 374186 (July 2, 1996). The ALJ's credibility determination is accorded great weight and deference because of the ALJ's unique opportunity to observe a witness's demeanor while testifying. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If the ALJ's credibility determinations are explained and supported by substantial evidence, a court is without authority to revisit those determinations. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *see also Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (noting the ALJ's credibility determination must not be "disturb[ed] absent [a] compelling reason"); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (stating that reviewing courts "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility").

Here, the ALJ evaluated Plaintiff's testimony and subjective complaints but found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (Tr. 31, PAGEID #83). In reaching this conclusion, the ALJ examined Plaintiff's medical records in detail and considered each impairment in turn.

For example, as to Plaintiff's cardiac condition, the ALJ noted, *inter alia*:

- in May 2010, Plaintiff reported experiencing no symptoms (Tr. 32, PAGEID #84; *see also* Tr. 330, PAGEID #382);

- in September 2010, Plaintiff's physician recommended that she "participate in 45 minutes of aerobic exercise at least five to six times a week and to follow-up with cardiology in 10 to 12 months" (Tr. 32, PAGEID #84; *see also* Tr. 313, PAGEID #365);

- "the claimant has not had any exacerbations of this condition, nor do the records reflect that the claimant has followed up with any specialized care for this condition since September 2010 indicating that this condition is not as severe alleged by the claimant" (Tr. 32, PAGEID #84);

- "the claimant continually reported no chest pain or palpitation and it was reported that her [coronary artery disease] was stable" (Tr. 32, PAGEID #84; *see also* Tr. 443-47, PAGEID #495-99); and

- Plaintiff's cardiac condition did "not appear to be causing any more than minimal functional limitations" (Tr. 32, PAGEID #84).

Taking all this into account, the ALJ determined that there was "no available evidence" that Plaintiff's cardiac condition would preclude her from performing a range of light exertional work activity. (Tr. 32, PAGEID #84).

As to Plaintiff's hepatitis and anemia conditions, the ALJ noted that, although Plaintiff suffered severe itching, "she had a gradual resolution of her symptoms." (Tr. 32, PAGEID #84; *see also* Tr. 334, PAGEID #386). More specifically, the ALJ observed that, just four months after Plaintiff "alleged becoming disabled, the claimant reported that she felt the best she had felt in months and that she had no other liver-related concerns." (Tr. 32, PAGEID #84; *see also* Tr. 334, PAGEID #386). At that time, laboratory testing showed improved condition, with just minor abnormalities, and Plaintiff was reportedly "asymptomatic." (Tr. 33, PAGEID #85; *see also* Tr. 335, PAGEID #387). The ALJ likewise observed that there was:

> no evidence of recurrence of jaundice, pruritus or other worrisome signs or symptoms of hemolysis or liver abnormalities. The claimant's liver condition and anemia have been reported to remain stable through the claimant's most recent medical records.

(Tr. 33, PAGEID #85; *see also* Tr. 443-56, PAGEID #495-508). Therefore, the ALJ concluded that he properly accommodated any symptoms caused by exacerbations of these conditions in determining Plaintiff's residual functional capacity. (Tr. 33, PAGEID #85).

As to Plaintiff's Hodgkin's lymphoma, the ALJ noted that, although imaging revealed abnormalities in May 2010, those abnormalities had been present since 2008, Plaintiff remained "asymptomatic," and Plaintiff's doctor did not make any recommendations for treatment. (Tr. 33, PAGEID #85; *see also* Tr. 330-31, PAGEID #382-83). The ALJ further observed that Plaintiff had not sought any additional treatment for this condition since 2010. (Tr. 33, PAGEID #85). Thus, the ALJ stated that he had given Plaintiff "the utmost benefit of a doubt" by including Hodgkin's lymphoma as a severe impairment and found that the specified "residual functional capacity would accommodate any limitations imposed by this condition" by limiting Plaintiff to a range of light exertional work. *Id*.

In addition, the ALJ found that medication was able to control Plaintiff's hypothyroidism and Dr. Geiger found her condition to be "stable" in October 2012 and February 2013. *Id*. The ALJ stated that, although the condition did not appear to be causing Plaintiff any functional limitations, "to afford the claimant the benefit of the doubt," he "considered this a severe impairment" and determined that the given residual functional capacity accommodates this condition. *Id*.

The ALJ also examined Plaintiff's lupus, which the Court discusses *infra*. Based upon his review and discussion of the objective medical evidence, the ALJ found:

> [o]verall, the claimant has a treatment history which fails to demonstrate a physical condition of the degree of severity for which she has alleged. The claimant has a cardiac condition for which there have been no exacerbations during the period at issue and with no residual effects. The claimant's hepatitis, anemia, and hypothyroidism seem to be controlled by medication with only a few exacerbations and all are remaining stable. The

12

> claimant's Hodgkin's disease has only been treated conservatively during the period at issue and, in fact, it was reported that the claimant was asymptomatic. The claimant's lupus does not appear to be causing any more than mild limitations on the claimant's ability to function. These conditions do not appear to be causing any more than minimal functional limitations a[t] this time.

*Id*. The ALJ also considered the opinions of the state agency consultants, who were "in lock step agreement" that Plaintiff had no severe impairments. (Tr. 34, PAGEID #86). Based on the foregoing, the ALJ concluded that Plaintiff's conditions were "not nearly as severe as alleged." (Tr. 33, PAGEID #85). However, to afford Plaintiff "the maximum benefit of the doubt," the ALJ "included all of these conditions as severe impairments and more than generously accommodated for them in the . . . residual functional capacity." *Id*.

The ALJ next observed that Plaintiff's daily activities undermined her credibility, because her activities "are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations." (Tr. 33-34, PAGEID #85-86). In particular, the ALJ noted, among other things, that Plaintiff takes care of pets, has no problems with personal hygiene, is able to prepare meals, does the dishes, folds clothes, dusts, shops, gardens, and volunteers. (Tr. 34, PAGEID #86). The ALJ further determined that Plaintiff's activities undermined her credibility concerning the severity of her symptoms and were "not consistent with a totally disabled individual." *Id*.

In addition, the ALJ considered the third-party report of Plaintiff's husband, James McGee, and found his statements did little to bolster Plaintiff's credibility. (Tr. 34, PAGEID #86; citing 8E). The ALJ made this finding because Mr. McGee's "statements come from an understandably biased point of view, and they are a mere rehash of claimant's subjective allegations, which . . . are inconsistent with the evidence as a whole." (Tr. 34, PAGEID #86).

The ALJ next determined that Plaintiff's work history also undermined her credibility.

13

*Id*.  Specifically, the ALJ noted that Plaintiff stopped working in 2007 "due to a business-related layoff rather than because of the allegedly disabling impairments," and "there is no evidence of a significant deterioration in [her] medical condition since that layoff." *Id*.; (*see also* Tr. 209, PAGEID #261).  Thus, the ALJ found a "reasonable inference" that Plaintiff's "impairments would not prevent the performance of that job, since it was being performed adequately at the time of layoff despite a similar medical condition." *Id*.

Based upon the foregoing, the ALJ noted and followed the appropriate standards, performed an appropriate evaluation of the evidence, and clearly articulated the bases of his credibility determinations.  Although the ALJ considered Plaintiff's subjective complaints, he found that those complaints were not entirely credible.  The analysis and credibility determination of the ALJ enjoy substantial support in the record.  Accordingly, the Court will not—and indeed may not—revisit that credibility determination, *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003), and the undersigned Magistrate Judge recommends overruling this statement of error.

> **B.    The ALJ's Determination that Plaintiff's Impairments Do Not Meet or Equal Listing 14.02**

Plaintiff next argues that the ALJ erred at Step 3 because the record contains evidence that she met or equaled Listing 14.02A.  A claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii)).  At Step 3 of the disability evaluation process, the claimant bears the burden of demonstrating that the criteria of a listing are met or that her impairment is the medical equivalent of a listing. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011);

*Jones*, 336 F.3d at 474.  In order to obtain reversal on this ground, a claimant must satisfy all of the criteria to meet the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  Although an ALJ's evaluation of the listings must contain sufficient analysis to allow for meaningful judicial review, *Reynolds*, 424 F. App'x at 415-16, the ALJ is not held to a "heightened articulation standard" for a finding that a listing has not been met or equaled.  *Bledsoe v. Bardhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

With respect to lupus, Listing 14.02(A) provides, in pertinent part:

14.02 Systemic lupus erythematosus.  As described in 14.00D1 with:

A.  Involvement of two or more organs/body systems, with:

1. One of the organs/body systems involved to at least a moderate level of severity; and

2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. § 404, Subpt. P, App. 1.  In support of her position, Plaintiff relies on the questionnaire completed by Dr. Cholak.  Dr. Cholak was not Plaintiff's treating physician and had not personally examined Plaintiff but had access to Plaintiff's medical records.  (Doc. 14 at 10). Plaintiff explains that:

> [u]sing this information and his own medical experience, Dr. Cholak determined that the Plaintiff had lupus which involved two or more organs/body systems (ocular, respiratory, cardiovascular, renal, skin neurological and mental).  (Tr. 453-454).  Dr. Cholak documented the Plaintiff's associated symptoms of aches, weakness, anxiety, and depression and constitutional symptoms of sever fatigue, fever, malaise, weight loss.  *Id.*

*Id.*  Plaintiff contends that the ALJ failed to give Dr. Cholak's opinion appropriate consideration because it demonstrates that her impairments meet or equal the criteria in Listing 14.02A.

The ALJ considered the questionnaire completed by Dr. Cholak, and noted:

15

> Dr. Cholak reported that the claimant had systemic lupus erythematosus which involved joints, muscles, ocular, respiratory, cardiovascular, renal, skin, neurological and mental body systems. He described the claimant's symptoms as aches, weakness, anxiety, and depression. He also reported that this condition involved two or more organs/body systems with significant, documented constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss. He further reported that this condition had lasted or was expected to last for at least twelve months.

(Tr. at 30, PAGEID #82). However, the ALJ found that Dr. Cholak's assessment was entitled to "very little weight" for several reasons. *Id*. First, the ALJ observed that Dr. Cholak was neither a treating nor an examining physician. *Id*. Next, the ALJ found that the longitudinal medical records did not support Dr. Cholak's conclusion. Finally, the ALJ "reviewed the records from the Mayo Clinic and [did] not find any significant medical evidence to support the severity of the complaints . . . ." *Id*.

To challenge the ALJ's analysis, Plaintiff relies on *Rockson v. Comm'r of Soc. Sec.*, No. 13-cv-14486, 2014 WL 5421239, at *5-7 (E.D. Mich. Oct. 24, 2014), a case in which the ALJ failed to satisfy his obligation of analyzing whether the plaintiff met the listing. In *Rockson*, the District Court noted that "[t]he ALJ did not reject [the plaintiff's] claim that she [was] suffering symptoms of lupus, nor did he reject the medical evidence attesting to those symptoms; instead, he challenge[d] the extent to which those symptoms affect[ed] her ability to perform work functions." *Id*. at *5. The District Court found that the ALJ's consideration of the plaintiff's ability to perform work functions "[was] irrelevant to a Listings determination under 14.00," and an inappropriate basis to find the plaintiff failed at Step 3. *Id.*

*Rockson* is inapposite. At Step 3 in this case, the ALJ did not accept the medical evidence supporting Plaintiff's symptoms, nor did he base his listing determination on her ability to work. To the contrary, the ALJ found that the medical evidence relied upon by Dr. Cholak and Plaintiff's medical record as a whole did not support Listing 14.02A's requirements. The

16

ALJ carefully examined the medical evidence relevant to lupus, including:

- at an appointment near the date of onset, Plaintiff "was found to be doing great with regards to her lupus." (Tr. 32, PAGEID #84; *see also* Tr. 472, PAGEID #524).

- at a follow-up appointment in April 2009, it was determined that Plaintiff "was doing okay" and "her condition was stable." (Tr. 32, PAGEID #84; *see also* Tr. 468, PAGEID #520).

- at a follow-up appointment six months later, "the claimant reported that she was using sunblock and was having good results." (Tr. 32, PAGEID #84; *see also* Tr. 353, PAGEID #405).

- in April 2010, "the claimant was noted to have an exacerbation of this condition with a lesion on her back. The claimant did not follow up on this condition for six months at which time it was noted that claimant had abnormal lesions on the back and chest. However, when reexamined on October 19, 2010, these areas were noted to be healed." (Tr. 32, citing Ex. 10F, PAGEID #84).

- in October 2012, "Dr. Geiger's assessment was chronic systemic lupus erythematosus; however, he found the claimant's skin to be normal upon examination. The claimant then did not follow up with Dr. Geiger for nearly four months, a[t] which time, the claimant presented for rash on her left arm, but the claimant reported that the rash was improving." (Tr. 32, citing Ex. 8F, PAGEID #84).

Based upon his review of the entire medical record, the ALJ determined that "while the claimant does have lupus, the severity of that . . . condition does not reach a debilitating level." (Tr. 32, PAGEID #84).

Plaintiff bears the burden of demonstrating that Listing 14.02A criteria are met or that her impairment is the medical equivalent of the Listing. Though Plaintiff disagrees with the ALJ's evaluation of her medical record, she points to no evidence beyond Dr. Cholak's assessment to demonstrate that she suffered from lupus that met the Listing in 14.02A. Thus, Plaintiff fails to demonstrate that the ALJ's finding is not supported by substantial evidence.

### C. The ALJ's Failure to Obtain a Medical Expert

Finally, SSR 96-6p, in relevant part, requires an ALJ to obtain an updated medical opinion "[w]hen additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p, 1996 WL 374180 (July 2, 1996).  An ALJ enjoys "substantial discretion" in determining if new evidence needs to be evaluated by a medical expert. *Primmer v. Comm'r of Soc. Sec.*, No. 2:14-cv-2245, 2015 WL 7294539, at *7 (S.D. Ohio Nov. 19, 2015).  Stated differently, SSR 96-6p "explicitly grants the ALJ the discretion to determine whether the newly-submitted evidence so changes the landscape of the claimant's impairments that an expert could now find them to medically equal a listing."  *Id*. (quoting *Johnson v. Comm'r of Soc. Sec.*, No. 13-11658, 2014 WL 4798963, at *8 (E.D. Mich. Sept. 26, 2014)).  The ALJ is not required to make an explicit determination as to whether the new evidence requires an updated medical opinion.  *See, e.g.*, *Johnson*, 2014 WL 4798963, at *9 ("The record substantially supports the ALJ's implicit determination that an updated medical determination is not required . . . ." (footnote omitted)).

After the state agency medical consultants had conducted their review, Plaintiff submitted additional Mayo Clinic records which reflect a small bowel obstruction and resulting surgery that took place before the onset date, lesions found prior to the onset date resulting from lymphoma, and a blood transfusion.  (Tr. 285-306, PAGEID #337-58).  The ALJ examined the additional medical records and found no need to obtain an updated medical opinion.  The Court cannot deem that to be an abuse of discretion.  Consequently, the Court finds no merit in Plaintiff's final statement of error.

**IV.     RECOMMENDED DISPOSITION**

For the reasons stated, it is **RECOMMENDED** that the Plaintiff's statement of errors be **OVERRULED** and that judgment be entered in favor of Defendant.

**V.      PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date:  May 2, 2016                                                        /s/ Kimberly A. Jolson
                                                                          KIMBERLY A. JOLSON
                                                                          UNITED STATES MAGISTRATE JUDGE